FRANCIS I. ELLICK, JR., V. JENNIE R. WILSON.

FILED MAY 17, 1899. No. 8912.

1. **Negligence:** CAUSE OF INJURY. Whether an injury is directly caused by an act or the former arises or flows from the latter proximately or naturally is a practical question rather than a theoretical one.

2. ———: PERSONAL INJURY: DAMAGES. A person whose safety is imperilled by the negligent act of another if injured in a reasonable and prudent attempt under the conditions and circumstances to escape the threatened danger may recover from the negligent one damages for the injury.

3. ———: ———: QUESTION FOR JURY. Whether the negligence and peril had existence and the attempt to avoid the latter was prudent and reasonable are usually questions of fact for the determination of a jury.

4. Instructions: REVIEW. Assigned errors of the giving designated instructions and refusals of others *held* without force.

ERROR from the district court of Dodge county. Tried below before MARSHALL, J. *Affirmed.*

*Frick & Dolczal,* for plaintiff in error.

*N. H. Bell, contra.*

HARRISON, C. J.

The petition filed in this case reads as follows: "The said plaintiff complains of the said defendant for on or about the 23d day of December, 1894, the said defendant recklessly, negligently, and wrongfully, with force and violence, threw and thrust some large and heavy planks or boards into a room in the Eno Hotel, in the city of Fremont, Nebraska, then used and occupied by plaintiff as a guest at said hotel, and plaintiff, without any fault or negligence on her part, in trying to avoid and escape from physical injury of which she was in imminent danger from the violence and wrongful act of defendant as aforesaid, dodged and made a sudden move backward and to one side, and thereby wrenched, sprained, and otherwise hurt and injured her right knee and the muscles, ligaments, tendons, and other parts thereof so that she became and was sick, sore, lame, and unable to attend to her ordinary affairs for the space of about one month, to her damage in the sum of $100, and was compelled to employ a physician at an expense of $15, and to pay for her board and lodging, care and nursing, at

said hotel the sum of $100. Plaintiff further says that her injuries so received as aforesaid are of a permanent nature and her physical vigor and bodily strength are impaired and will be during her natural life, and she will continue to suffer, as she has suffered heretofore, great mental anguish and bodily pain from the same; that she is a poor woman, dependent on her earnings as a working girl for her support, and by reason of said injuries her capacity for earning a living has been very much diminished, to her damage in all in the sum of $5,000, for which sum, with costs of suit, she claims judgment against said defendant." The answer was a general denial. A trial of the issues resulted in a judgment for the complainant, to reverse which is the purpose of a proceeding in error to this court.

When during the trial it was announced that the defendant in error rested her case counsel for plaintiff in error moved an instruction to find for plaintiff in error, "for the reason that no recovery can be had in law in this case, for the reason that it appears from the evidence that the injury complained of is not the approximate or reasonably to be expected result, and that the result was a mere accident in law." This was refused, and that it was is of the errors alleged and argued. It is disclosed by the evidence that the defendant in error and her sister were at the Eno Hotel, in Fremont, this state, and about 11 o'clock P. M. of December 23, 1894, went to their room in the hotel, and what further occurred will as well appear from portions of the evidence which we will quote. The defendant in error testified as follows:

Q. Now go on. Just state what transpired.

A. Well, we lit the lamp and my sister got ready for bed, and I was almost ready for bed. I heard my sister scream. I looked up to the transom and saw a large board sticking up through the transom, about two feet, I think it was, and I walked over to the door to see if I could see anybody in the hall. Of course we could not leave the board there all night. Mr. Ellick was standing

in the hall. I closed the door and locked it again, and pretty soon I heard Mr. Ellick laugh, and he said, "I will take the board down, girls," and instead of taking the board down he shoved it on into the room. I was standing by the wash-stand. It was right over my head. The board kind of tottered, and I stepped one side, and fell. I thought the board was going to hit me.

Q. Well, what then?

A. I fell, and I fainted after I fell down, and my sister threw some water in my face and helped me to bed, and I staid in bed a few minutes, I thought it would make my knee get better, it hurt me so; and she went over and called Mrs. Blue and she rubbed some liniment on my knee. It didn't help it any. They sent for Dr. McDonald about 12 o'clock, when he came and bandaged it up in some muslin until next morning. I didn't sleep any that night.

Q. How was it as to paining?

A. It pained me all night, and the next morning Dr. McDonald came and put a splint on my knee.

She further stated:

Q. How near did the board come to your head?

A. Why, I could reach it with my hand, if I raised my hand this way. I could touch the board.

Q. How was the board managed while it was in that position?

A. I thought it was going to fall down and hit my head, that is when I fell I jumped to one side.

The sister stated:

Well, I retired first. Sister wasn't ready yet. I heard a noise toward the transom, like the scraping of a board, and looked toward the transom and screamed, and my sister opened the door and saw Mr. Ellick in the hall and closed the door, and immediately after the door was closed I heard some one laugh, and I recognized the voice as being Mr. Ellick.

Q. How long had you known Mr. Ellick at that time?

A. I don't know just how long, a few weeks.

Q. How had you known him?

A. Why he boarded at the hotel. I waited on him in the dining-room.

Q. You saw him several times every day?

A. Yes, three times.

Q. Was he a considerable of a hand to laugh, or otherwise? Had you heard him laugh before?

A. Yes, several times.

Q. You say you screamed, she opened the door, and then what,—then you heard him laugh?

A. I heard him laugh. Then he pushed the board over, and my sister thought to prevent it striking her head. She jumped quick to one side and fell forward.

The plaintiff in error stated that he went upstairs to go to his room, and when near the room in which the defendant in error and her sister were one of them called to him and requested him to "take the board away that was against the transom." There seemed to be a board against the transom. The board or boards were about twelve or fourteen feet in length and were so placed that the one end was in the room about two feet and the other rested on the hall floor. The plaintiff in error further testified: "I picked it up at the end, and being acquainted with the girls, and always in a cutting up way around there, I just pushed it in about half way, took it out and put it where the rest of the boards were and went to bed." The contention for plaintiff in error under the assignment of error to which we have referred is that there was no liability, for the reasons that it was shown that the injury to defendant was an accident and not a direct and natural consequence of the act of plaintiff in error,—not an effect of which his act was naturally the cause or which could be expected as a result; that he owed no duty toward defendant in error except such as one member of society owes to another, and his act was without malice, bad motive, or purpose. It has been stated on this subject: "Though an inquiry as to what is the proximate cause of an injury, from a legal point of view, often

involves, in a sense, metaphysical subtleties and distinctions, in determining what are and what are not the proximate consequences of an act, the law favors practical distinctions rather than those which are merely theoretical.   In fact a result may be physically secondary and consequential, and yet in legal contemplation proximate. In this connection it has been well said that 'the law is a practical science, and courts do not indulge refinements and subtleties as to causation that would defeat the claims of natural justice.'  So impossible is it to lay down any general rules of uniform application in this connection, that it is almost conceded that each case must be decided with reference to its own particular facts or, as it was said by one court: 'Many cases illustrate, but none define, what is an immediate or what is a remote cause.   Indeed, such a cause seems to be incapable of any strict definition which will suit in every case.'   To a sound judgment must be left each particular case."   (8 Am. & Eng. Ency. Law [2d ed.] 567.)   In the case at bar the act of plaintiff in error in pushing the board into the room was, to say the least, a reckless and careless one and no doubt planned and calculated to have some effect on the inmates thereof, a very probable one of which might very reasonably be expected to be that of fright or fear, and it would not be unreasonable to contemplate that there might be an attempt to escape what might well be viewed as a threatened injury. Whether the party injured had good reason to apprehend danger and acted with reasonable prudence under the circumstances were questions of fact for the jury, and not in this case of law for the court (8 Am. & Eng. Ency. Law [2d ed.] 581), and in view of all the evidence we cannot say that the decision of the jury was clearly wrong; hence it will not be disturbed.

There were some instructions given by the court to present to the jury the questions which in another branch of the case we have just considered, and it is urged that the ·exposition of them was too narrow, and it is stated that

with a view to correct said defect and others there were requested for plaintiff in error certain instructions, which were refused. That the first to which we have referred were given and the latter refused were of the assignments of error, and they are now urged in argument. We have made a careful examination of these matters, and are forced to conclude that the instructions given were thoroughly pertinent and applicable to the conditions and circumstances developed in evidence and not open to the criticisms made; and those refused being on the same subjects covered by the ones read it was not error to refuse to read them; furthermore, relative to the one refused numbered 2, it contained some objectionable matter. No errors have been established and the judgment must be

AFFIRMED.